UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JACKIE ROBINSON,

    Petitioner,

    v.

BEN CURRY, warden,

    Respondent.

                                        /

No. C 08-4565 MHP (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Jackie Robinson, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Robinson was convicted in 1978 in San Diego Count Superior Court of first degree murder, false imprisonment, rape and first degree robbery. Enhancements for the commission of a felony while armed, while using a dangerous or deadly weapon, while using a firearm, and for the infliction of great bodily injury were found true. For those convictions, he was sentenced to 7 years to life in prison in 1978. His habeas petition does not challenge his conviction but instead challenges a July 10, 2007 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole.

The BPH identified the circumstances of the commitment offense, Robinson's unstable social history, his insufficient participation in beneficial self-help in light of evidence of a documented substance abuse problem, and the psychological evaluation that

put him at moderate to low risk of violence as the reasons for finding him unsuitable for parole.

Robinson sought relief in the California courts. The San Diego County Superior Court denied his petition for writ of habeas corpus in a reasoned decision. The California Court of Appeal also denied his petition in a reasoned decision. Resp. Exh. 4. The California Supreme Court summarily denied his petition for writ of habeas corpus.

Robinson then filed his federal petition for a writ of habeas corpus. The court found cognizable his claim that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole, as well as his claims for equal protection and ex post facto violations. Respondent filed an answer. Robinson did not file a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), ©. The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits

2

in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.  <u>State Law Standards For Parole For Murderers In California</u>

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. Today, a first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.  At the time Robinson committed the murder in this case, the minimum tem before parole eligibility was seven years.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.

Penal Code § 3041(b). California law adds a layer of review by giving the Governor the power to review the BPH decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).  Although the Governor must consider the same factors as the BPH, his review is an "independent, de novo review," and he therefore "has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety."  In re Shaputis, 44 Cal. 4th 1241, 1258 (Cal. 2008)

Under the regulations applicable to Robinson, as a parole applicant who committed a murder before November 7, 1978, a parole date shall be denied if the prisoner is found to be unsuitable under § 2281(c) and shall be set if the prisoner is found to be suitable under § 2281(d). 15 Cal. Code Regs. § 2280. "The panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2281(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2281(b).

The regulations contain matrices of suggested base terms for several categories of crimes, including first degree murder. See 15 Cal. Code Regs. § 2282. For example, for first degree murders, the matrix of base terms ranges from a low of 8, 10, or 12 years to a high of 18, 20, or 22 years, depending on some of the facts of the crime. However, the statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. The matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2282(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's

4

current dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008) (emphasis in source). Where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Id. at 1191 (emphasis in source).

B.      Federal Habeas Relief On Parole Denial Claims

The U. S. Constitution's Due Process Clause does not itself provide state prisoners with a federal right to release on parole. Hayward, 603 F.3d at 561. The substantive law of a state might create a right to release on parole, however. See id. at 555, 559. Although Hayward purported not to reach the question whether a California's substantive law created a federally protected liberty interest, see id. at 562, later cases from the Ninth Circuit have said or assumed it does. See Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . . By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause."); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty interest created by California's 'some evidence' requirement"); see also Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.' McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some evidence' of current dangerousness. Hayward [603 F.3d at 562-63.]") Hayward's application and these

later cases make it clear that in the Ninth Circuit there is federal habeas relief available under §2254 for California prisoners denied parole without sufficient evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the Governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)). That requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes omitted) (quoting Lawrence, 44 Cal. 4th. at 1210, 1213-14); see also Cooke, 606 F.3d at 1214 (describing California's "some evidence" requirement).

When a federal court considers a habeas case directed to a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2) for whether the decision was "based on an unreasonable determination of the facts in light of the evidence." Cooke, 606 F.3d at 1216 (citing Hayward, 603 F.3d at 563).

C.   Robinson's Case

   1.   His Circumstances

The Commitment Offense: In September 1977, Robinson was a Marine stationed at Camp Pendleton. On September 2, 1977, Robinson stole his .45 caliber pistol from the armory prior to leaving work, and set out to kill his wife, who had left him about a month

6

earlier. A note believed to have been written by Robinson was found in a desk drawer at his work place a week after the murder that stated, "I'm going to kill my wife this weekend can't nobody stop me ha ha." Petition Exh. B, 4/4/78 Probation Officer's Report at 5. Before he reached his wife in Los Angeles, he encountered the woman he ultimately murdered.

On September 3, 1977, 19-year old Sophie Ann Martinez was reported missing by her husband. She had left home at about 12:30 that day to go to a grocery store to buy food.

On September 4, 1977, Robinson was found in Sophie Ann Martinez's car in Culver City, and was arrested for carrying a loaded firearm in a vehicle and suspicion of grand theft auto. "He had admitted taking the car from the Oceanside area and was en route to Culver City for the purpose of killing his wife. Blood was found on the shirt which the defendant was wearing. In the vehicle was found a bag of groceries with dried blood on the bag. There was also a fresh puddle of blood in the rear of the vehicle." Id. at 2-3. He was interviewed by police that day.

> When asked about Mrs. Martinez he first stated he had not seen her, and then said he'd met her in the parking lot of a market. She drove him to his residence and at the apartment he told her he was going to take her car and go to Los Angeles to kill his wife. The victim began to argue, scream and carry on, at which time Robinson struck her across the face with his hand, as he did not want her to make any more noises. He tied her with a rope and torn sheets to the legs of the bed. He stuck tissue paper in her mouth and gagged her with a tee-shirt.

7/15/07 BPH parole hearing reporter's transcript ("RT") 15. The District Attorney "indicated the defendant abducted the victim from the shopping center lot, took her to his apartment where she was beaten, choked, dunked underwater in a bathtub, tied to the bed and gagged." RT 16. Robinson told police that he had forced her head under the water in the tub when she had been shouting and she thereafter was quiet and cooperative. Petition Exh. B, 4/4/78 Probation Officer's Report at 5. He then took her back to the car and proceeded toward Los Angeles County. Robinson told police that:

> [n]ear a rest area north of Oceanside the victim began to argue and Robinson pushed her out of the vehicle. When she attempted to reenter the vehicle he began to fight with her. And though he may have struck her with an open hand a few times, he pulled her from the vehicle and pushed her slightly down an embankment, withdrew the .45 caliber automatic from his belt and fired one shot. He saw the victim roll down the embankment.

7

1  RT 16.  She was shot through the head while she lay on the ground.  She had been raped.  <u>Id.</u>

2    <u>Social History</u>:  A few weeks before he raped, robbed and murdered Sophie Martinez,

3  Robinson's wife had left him and went to stay with her uncle in Los Angeles.

> Since that time the defendant had plagued them with telephone calls and on one occasion (8-5-77 at 9:30 a.m.) he came to the residence with a handgun and threatened his wife, her aunt and uncle.  The Los Angeles Police Department responded to the disturbance and detained the defendant.  The defendant's wife stated she married him two years ago and it was a failure from the beginning.  They came to Oceanside from Tennessee when the defendant decided to re-enlist in the Marine Corps.  He lost his temper frequently and would often slap her around.  He became very possessive and insisted on having sexual intercourse frequently.  She hesitated to speak of sexual acts preferred by the defendant but did state that on one occasion he wanted to tie her to the bed and have intercourse.  She indicated that about two weeks earlier the defendant came to Los Angeles and took her back to Oceanside against her will.  During the trip back he continually threatened suicide if she would not return to him.  (A short time before he had drank bleach and tried to kill himself but ended up at the Naval Hospital at Camp Pendleton.)  When the defendant finally calmed down his wife was able to obtain her car and return to Los Angeles.  On 9-4-77 when the defendant was arrested he was in the immediate location where his wife and aunt were helping a friend move in to a new residence.  It was evident that he had followed his wife to that location from the Los Angeles residence of her uncle.

Petition Exh. B, 4/4/78 Probation Officer's Report at 5.

  Robinson used marijuana and alcohol after his wife left him to deal with his stress. <u>Id.</u> at 6; <u>id.</u> at 38.

  Robinson had no prior criminal record.

  <u>Post-Incarceration Behavior</u>: Robinson had generally favorable institutional behavior, although apparently not much recent programming.  Other than taking a single 2-hour video course in inmate employability and an anger management course in 2007, Robinson had not done any vocational training, group activities, or therapy in the last eight years.  RT 22-26, 49, 51.  Earlier he had been in the Cat X group program (1985) and the Cat T group program (1986), had taken a leadership action course (1987), had taken a course in personal dynamics (1986), and had been in group therapy (1990).  He had participated in Alcoholics Anonymous in the 1980s and from 1990-1992.

  In the eight years preceding the hearing, he had worked in the wood products industry and had for several years received exceptional reviews. Earlier in his incarceration, in 1983, he had obtained a vocational achievement certificate in machine shop operations.  He also

had acquired skills in HVAC work in 1992 and worked as a steamfitter in the early 1990s.

Robinson had graduated from high school before his incarceration, and he had taken some college courses many years earlier in prison.

He had only a very limited and very old disciplinary record. He had received two CDC-115 disciplinary write-ups: one in 1984 for refusing to work and one in 1979 for being out of bounds. He had received three CDC-128 counseling memos for lesser transgressions, the last of which was in 1988.

<u>Psychological Evaluation</u>: The most recent psychological evaluation was prepared on March 23, 2007. Petition, Exh. C. The psychologist opined that "this inmate represents a Moderate to Low risk of violence." <u>Id.</u> at 7. The psychologist pointed out that "there is the caveat that such an assessment is at least partially based on the likelihood of continued abstinence from substance abuse." <u>Id.</u> at 8. Several factors increased Robinson's risk of violence in the community: "there was a history of relational violence with his ex-wife. While he does not appear to have a substance abuse history, alcohol and marijuana were aggravating factors in the controlling offense. The absence of a characteristic pattern of violence in the face of a murder conviction highlights the reality that if the inmate were to engage in alcohol abuse in the future, he is likely to find himself in a disinhibited state, with poor impulse control and declining judgment. If he were to feel hopeless or depressed, as he stated he did during the controlling offense, the combination of those emotions with poor behavior controls may significantly increase his risk of future violence." <u>Id.</u> at 7-8. On the other hand, there were several factors that decreased his risk of violence: the absence of a major mental illness and a substance abuse problem, as well as the existence of a positive social support network, stable work history and vocational skills, insight about the crime, a sense of empathy for the victims, and favorable scores on certain psychological tests. <u>Id.</u> at 8.

  2. <u>BPH's Decision And State Court Review</u>

The BPH determined that Robinson was "not suitable for parole and would pose an unreasonable risk of danger to society if released from prison." RT 46. The reasons relied

upon to reach this conclusion were several. First, there was the nature of the commitment offense, which involved a dispassionate and calculated killing (as the victim was shot in the head after she was already out of the car and posed no threat of any sort), was carried out in an especially cruel and callous manner (in that the woman was "kidnapped. beaten, gagged, raped, her head was held underwater and eventually was shot with a stolen .45 automatic" by Robinson, RT 46), and was done for an inexplicable motive. The BPH also relied on the unstable social history, which was a brief period of instability associated with failing marriage and his break-up from his wife during which he used alcohol and marijuana. The BPH also relied on Robinson's insufficient participation in beneficial self-help. On this point, the BPH pointed out that Robinson's record had a lot of references to substance abuse, including his use of alcohol leading up to the commitment offense. See RT 48, 50, 52. Lastly, the BPH relied on the unfavorable psychological evaluation in which Robinson was estimated to present a moderate to low risk of violence if released.

The California Court of Appeal upheld the BPH's decision in a reasoned decision. As the last reasoned decision from a state court, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The state appellate court explained:

> In this case, there is "some evidence" to support the Board's decision. The Board could properly rely on the circumstances of the commitment offense. (In re Dannenberg (2005) 34 Cal.4th 1061, 1095-1096; Rosenkrantz, supra, 29 Cal.4th at p. 683), including that the offense was committed in an especially cruel and callous manner (§ 2402, subd. (c)(1)), in a dispassionate and calculated manner, such as execution-style (§ 2402, subd. (c)(1)(B)), and in a manner that demonstrates an exceptionally callous disregard for human suffering (§ 2402, subd. (c)(1)(D)), and that the motive was trivial in relation to the offense (§ 2402, subd. (c)(1)(E)). The Board also properly considered petitioner's unstable social history (§ 2402, subd. (c)(3)), his participation in institutional programs (§ 2402, subd. (d)(9)), his institutional behavior (ss2404, subd. (c)(6)); psychological factors (§ 2402, subd. (c)(5)); and petitioner's parole plans (§ 2402, subd. (d)(8)). Because there was some evidence to support these factors in the Board's decision, we deny the petition. (In re Rosenkrantz, supra, 29 Cal.4th at p. 658.)
>
> This is not a case in which the Board relied solely on the unchanging facts of the crime, as petitioner suggests. Not only is there some evidence to support the individual unsuitability factors, but there is also some evidence to support the ultimate decision that petitioner poses an unreasonable risk of danger to society if released from prison. [Citations.] In our independent review of the record, we conclude that petitioner's psychological evaluation

10

> constitutes some evidence that petitioner presently poses an unreasonable risk of danger to society. [Citation.] <u>Petitioner's present psychological status is the nexus between his past behavior and present dangerousness</u>. We therefore conclude the Board properly found petitioner unsuitable for parole and that petitioner's due process rights have not been violated.

Resp. Exh. 4 at 5-6 (emphasis added).

       3. <u>Analysis Of Claim</u>

The California Court of Appeal's decision did just what <u>Lawrence</u> commanded by determining that there was a nexus between the reasons relied upon by the BPH and the ultimate determination that they said showed current dangerousness. The state appellate court articulated the some evidence standard, found some evidence of several circumstances and showed that the listed circumstances fit the regulatory criteria showing parole unsuitability. Although that court applied the wrong regulation – as it identified the applicable regulation as 15 Cal. Code Regs. § 2402, whereas 15 Cal. Code Regs. § 2281 should have been used because Robinson committed his murder before November 7, 1978, <u>see</u> 15 Cal. Code Regs. § 2400 – that does not affect the outcome because the regulations have essentially the same criteria.

The first degree murder, robbery and rape were committed many years ago; Robinson had been in prison for about 30 years on the sentence for those crimes; and Robinson had a largely positive prison record. However, that 2007 psychological evaluation – especially with its comments about the substance abuse concerns based on his episodic use of alcohol – that put him at a moderate to low risk of violence if released was critical. The California Court of Appeal appropriately considered whether there was some evidence to support the findings, and took the next step that is essential under <u>Lawrence</u> by linking those circumstances to the current dangerousness question. The state appellate court found that necessary nexus to current dangerousness in the unfavorable psychological evaluation. As the court determined, Robinson's "present psychological status is the nexus between his past behavior and present dangerousness." Resp. Exh. 4 at 6. As in <u>Hayward</u>, the psychological evaluation was "far from damning," but in light of the conclusion in it that the prisoner represents a low to moderate risk of danger to the community, the state court did not

11

unreasonably determine that there was some evidence that the prisoner's release would pose a possibly moderate risk to public safety. See Hayward, 606 F.3d at 570 (Berzon, J., concurring) (state court did not unreasonably determine that psychological evaluation estimating a low to moderate risk of future violence if released into the community and the assessment of the commitment offense and prisoner's violent history were evidence of that his release would pose a possibly moderate risk to public safety).

The state appellate court's rejection of Robinson's petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Robinson therefore is not entitled to federal habeas relief on this claim.

D.      The Equal Protection And Ex Post Facto Claims

Robinson contends that his rights to equal protection and to be free from ex post facto laws were violated by the parole authority. Petitioner's exact argument is muddled by page upon page of the history of California's sentencing laws and regulations – most of which do not apply to him -- but as the court understands it, his argument boils down to a contention that laws and regulations that existed before July 1, 1977, as well as some laws and regulations that existed thereafter to deal with a change in California's sentencing scheme that occurred on July 1, 1977 should have been applied to his case. In part, he claims an entitlement to have his term fixed at a set number of years.

California used an indeterminate sentencing law ("ISL") until 1977 and has used a determinate sentencing law ("DSL") since July 1, 1977. Under the ISL, the trial court did not set a term of years but instead sentenced the defendant to a usually wide range of years as provided by law, such as "1 year to life" and the parole authority then would determine the length of the term each defendant actually would serve. When a person was convicted of an offense for which imprisonment was prescribed by law, the court imposing the sentence did not fix the term or duration of the period of imprisonment. See In re. Rodriguez, 14 Cal. 3d 639, 643 n.4 (Cal. 1975) (quoting former Cal. Penal Code § 1168). Instead, the Adult Authority was authorized to determine the length of time a person should remain in prison

1  within the outer limits of the indeterminate sentence imposed. See id. at 645 n.11 (quoting
2  former Cal. Penal Code § 3020).  The Adult Authority also was authorized to allow prisoners
3  to go upon parole.  See id. at 645 (quoting former Cal. Penal Code § 3040).  The matter of
4  parole was discretionary, as the Adult Authority was permitted to determine parole "at any
5  time after the actual commencement of such imprisonment." Id. at 646 (quoting former Cal.
6  Penal Code § 3041).  As of July 1, 1977, the DSL replaced the ISL.  The DSL prescribed
7  sentences of a set duration for each crime, e.g., 2, 4 of 6 years in prison for first degree
8  burglary, see Cal. Penal Code § 461.  However, the sentences for most murders (and some
9  kidnappings) remained indeterminate.  The foregoing brief history of the ISL and the DSL
10 provides necessary background to the state court cases on the term-setting duties of the
11 parole authority.

12         Under California law, a prisoner whose maximum term may be disproportionate to his
13 individual culpability has a right to have his term set at a number of years that is
14 proportionate to his offense so as to avoid the imposition of cruel and unusual punishment.
15 See generally Rodriguez, 14 Cal. 3d at 651-52.  The question in Rodriguez was whether the
16 prisoner's indeterminate life sentence amounted to unconstitutional cruel and unusual
17 punishment.  Rodriguez had served 22 years of an indeterminate 1-year-to-life sentence for
18 lewd conduct on a child (see Cal. Penal Code § 288) and claimed that his life maximum
19 sentence was disproportionate to the offense and thus violated both the state and federal
20 constitutional prohibitions on cruel and unusual punishment.  The court noted that a
21 conviction under Penal Code § 288 could be based on a great range of conduct, some of
22 which was extremely serious and some of which was far less serious; thus, § 288
23 "encompassse[d] conduct for which life might be a permissible punishment in some cases but
24 excessive in others."  14 Cal. 3d at 647.  In order to analyze Rodriguez's cruel and unusual
25 punishment claim, it was necessary to look beyond the facial validity of § 288 and consider
26 the particular sentence Rodriguez received for his violation of § 288.  See 14 Cal. 3d at 648-
27 49.  To do so, a term of years had to be set for the court to determine whether that term
28 violated the prohibition on cruel and unusual punishment for that prisoner's crime.

1    Significantly, if a term was not set for a prisoner, the term would be presumed to be the
2    statutory maximum.  See Rodriguez, 14 Cal. 3d at 654 n.18.
3            Less than two months before Rodriguez, the California Supreme Court stated that "a
4    defendant under an indeterminate sentence has no vested right to have his sentence fixed at
5    the term first prescribed by the Adult Authority or any other period less than the maximum
6    sentence provided by statute. . . .  It has uniformly been held that the indeterminate sentence
7    is in legal effect a sentence for the maximum term, . . . subject only to the ameliorative power
8    of the Adult Authority to set a lesser term. . . . .  But these propositions, valid in the abstract,
9    must be qualified when the maximum term is challenged as disproportionate.  In such a case
10   a defendant has an undeniable vested right in insuring that his term be fixed proportionately
11   to his offense."  People v. Wingo, 14 Cal. 3d 169, 182 (Cal. 1975) (citations and quotation
12   marks omitted).  The Wingo court further  explained that, "in the case of a life term convict
13   who the [parole authority] does not believe merits a lesser term it may, and customarily does,
14   act by simply refraining from fixing his term at a span of years.  Since by statute he is already
15   serving a life term there is no occasion for the [parole authority] to re-declare the fact."  Id. at
16   183 (citations and quotation marks omitted).   Lastly, the court recognized that term-setting
17   was not mandatory, when it referred to the time for filing a habeas petition as being "when
18   such a term is set, or if the Authority within a reasonable time decides not to fix a term."  Id.
19   at 184; see also id. at 184 n.16 (rejecting dissent's assertion that the majority opinion is
20   altering the ISL, and stating that the opinion does not affect the discretion vested by law in
21   the parole authority).
22           Rodriguez does not create an enforceable right to have a term of years set.  Rodriguez
23   and Wingo establish that the parole authority has a duty to set a term of years and that the
24   term will be presumed to be the statutory maximum if no term is set.  The term-setting is
25   done as a means to the end of doing a cruel and unusual punishment analysis and not as an
26   end to itself.  Life imprisonment for a murder (or this petitioner's particular murder) is not
27   disproportionate; therefore, no cruel and unusual punishment analysis is done and there is no
28   need for term-setting as a step for such an analysis.  His term of imprisonment is presumed to

1  be the statutory maximum of life imprisonment.  There is no independent duty to fix a term
2  for a life prisoner who has been convicted of a murder.  If a duty exists, it would be under the
3  parole statute, but that statute requires another determination to be made first.
4        Under California law, a life prisoner must first be found suitable for parole before a
5  parole date is set.  See In Re Stanworth, 33 Cal. 3d 176, 183 (Cal. 1982).  Where, as here, the
6  life prisoner has not been found suitable for parole, there is no obligation to set a parole
7  release date.  See In re Dannenberg, 34 Cal. 4th at 1070-71; 15 Cal. Code Regs. § 2403(a)
8  ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").
9  The parole authority has not reached the point where it needs to fix a term and set a parole
10 release date because petitioner has not been found suitable for parole.
11       Robinson seeks to cast himself as someone who is entitled to consideration under the
12 pre-1977 sentencing scheme.  The fatal flaw in this argument is that he committed his crime
13 after the change in the sentencing scheme.  The new sentencing law took effect on July 1,
14 1977, and Robinson's key dates post-date that change in the law – he committed the murder
15 on September 3, 1977, was convicted on March 6, 1978; and was sentenced on April 4, 1978
16 – notwithstanding his arguments to the contrary.  Thus, for example, in light of the fact that
17 California Penal Code § 1170.2 by title and by text applies to felonies committed "prior to
18 July 1, 1977," Robinson's argument that the "[f]ailure to apply Penal Code § 1170.2(b), to
19 petitioner is a denial of equal protection under the United States and California
20 Constitutions" makes no sense.  Petition, p. 46; see also id. at 60 (various parole authorities
21 "failed to properly apply controlling state law (Penal Code § 1170.2)").  Likewise,
22 Robinson's assertion that a certain provision "applies only to prisoners committed to state
23 (sic) for crime(s) committed on or after July 1, 1977, and not to petitioner as was shown," is
24 factually incorrect because his crime was committed after July 1, 1977.  See Petition, p. 49.
25       Robinson's argument also fails on the law.  The failure to set a parole date did not
26 violate the Ex Post Facto Clause, U.S. Const. art. I, § 10.  "To fall within the ex post facto
27 prohibition, a law must be retrospective -- that is, 'it must apply to events occurring before its
28 enactment' -- and it 'must disadvantage the offender affected by it,' . . . by altering the

definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441 (1997) (citations omitted).  The California law concerning the setting of a parole date was not changed.  The ISL and DSL both required that the prisoner be found suitable for parole before a parole date could be set.  See Stanworth, 33 Cal. 3d at 183.  And the ISL and DSL both used the same criteria for determining whether a prisoner was suitable for parole.  See Connor v. Estelle, 981 F.2d 1032, 1033-34 (9th Cir. 1992).  The Ex Post Facto Clause was not violated because the law did not change to the detriment of the prisoners, even if Robinson was a pre-DSL inmate.  Robinson's equal protection claim fares no better because he has not shown any unequal treatment of similarly situated people. Because the claims are meritless, the court will not address the untimeliness contention made by respondent.

E.      Certificate Of Appealability

A certificate of appealability is GRANTED as to the due process claim regarding the existence of some evidence to support the decision.  See 28 U.S.C. § 2253©.  Reasonable jurists could find the district court's assessment of the claim debatable.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  A certificate of appealability is denied as to all other claims.  Robinson is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 12, 2010

Marilyn Hall Patel
United States District Judge